IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 11, 2015 Session

**ROBERT L. MITCHELL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2005-A-241      Steve Dozier, Judge**

**No. M2014-02298-CCA-R3-HC – Filed October 29, 2015**

A Davidson County jury convicted the Petitioner, Robert L. Mitchell, of one count of especially aggravated kidnapping, two counts of aggravated kidnapping, and one count of assault. The trial court sentenced him to an effective sentence of thirty-seven years of incarceration. This Court affirmed his convictions and sentence on appeal. *State v. Robert L. Mitchell*, No. M2005-01652-CCA-R3-CD, 2006 WL 1506519, at *1 (Tenn. Crim. App., at Nashville, June 1, 2006), *perm. app. denied* (Tenn. Nov. 13, 2006). After unsuccessfully seeking post-conviction and habeas corpus relief, the Petitioner filed a second petition for habeas corpus relief that is the subject of this appeal. He challenged his conviction for especially aggravated kidnapping, alleging first that the allegation of "force, threat, or fraud" in the indictment for especially aggravated kidnapping did not support his conviction and, second, the indictment failed to charge aggravating factors that he asserts were required to support his conviction based upon the fact that he was the parent of the victim. The habeas corpus court summarily dismissed the Petitioner's petition, and he now appeals. On appeal, we conclude that the habeas corpus court did not err, and we therefore affirm its judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J. delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ. joined.

Karen McDonald, Nashville, Tennessee, for the appellant, Robert L. Mitchell.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Rachel Sobrero, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

# A. Facts and Procedural History

This Court summarized the facts supporting the Petitioner's convictions in his first appeal as follows:

On February 4th and 5th, 2004, the [Petitioner] committed a series of acts against his wife, C.F.M., FN1 who was the primary victim of the crime, and his nine-year-old stepdaughter, B.R.S., which led to the various convictions. The events began at the family home in Davidson County, where the [Petitioner] had not resided for the previous three months, and ended at the residence of the [Petitioner]'s brother, Michael Maynard, in Smith County.

> FN1. Because of the sensitive nature of this case, the victims and the minor children will be referred to by their initials.

## State's Proof

At trial, B.R.S. testified that on the morning of February 4, 2004, she was at home sleeping when she heard a "bang on the door" and screams from her mother. She recalled that as the [Petitioner] and her mother then entered her bedroom, the [Petitioner] exclaimed that "he was not there to hurt her, he was just there to come back to his family." When B.R.S. noticed that her mother's "head was hurt," the [Petitioner] pulled the plug from the telephone and warned, "If you try and call the police, I'm gonna snap your neck." B.R.S. described herself as crying and scared and described the [Petitioner] as mad and "yelling in a high tone." According [to] B.R.S., the [Petitioner] ordered her to dress because they were "going for a ride." B.R.S. testified that her brother, B.M., and her sister, R.M., who were in separate bedrooms, also dressed and joined her and her mother, who had "blood all over her hands and face," in the living room. B.R.S., who said that she did not want to go with the [Petitioner] because she was fearful for herself and the others, got in the backseat of the sport utility vehicle. She recalled that as her mother and siblings also got into the vehicle, the [Petitioner] directed her to the cargo area of the vehicle where she went to sleep. Before falling asleep, however, B.R.S. overheard the [Petitioner] announce that her mother's parents were dead. She testified that when she awoke, she was at the home of her uncle, Michael Maynard. B.R.S. remembered that the [Petitioner] asked Maynard for a gun and that everyone spent the night at the house. She testified that she was in the living room with her mother, her siblings, and Maynard for "an hour or

2

two" while the [Petitioner] slept. B.R.S. stated that her mother was still bleeding when they arrived at Maynard's house, but the [Petitioner] never took her to a hospital, and when the police arrived, he tried to run out the back door. B.R.S. testified that she had called the police on a prior occasion when the [Petitioner] had pointed a gun at her mother and her uncle.

Seven-year-old R.M., who on the date of the offense also heard a "bang" and her mother screaming and running, testified that the [Petitioner], who was "[k]ind of mad" because her mother was not wearing her wedding ring, ordered her to get dressed. R.M. recalled seeing blood in the hallway and the bathroom and on her mother's face and also noticed that the front door of the house had been "kicked in and broken." She was in the back of the vehicle with B.R.S. as they traveled to Maynard's house. According to R.M., her mother was still bleeding when they arrived at Maynard's residence and the [Petitioner] told them to go inside, where they watched television. She recalled that the [Petitioner] whispered to her that when he found a gun, he intended to shoot her mother and himself. R.M. testified that she told her mother what the [Petitioner] had said and that her mother later made dinner for everyone at Maynard's house, where they spent the night.

The victim testified that the [Petitioner] had not lived in their Nashville residence since November 2003 and that she had paid the mortgage and the utility bills. She stated that she thought the [Petitioner] was living with his mother. The victim testified that she was awakened at 5:00 a.m. on February 4, 2004, which was a school day, when she heard "a big bang" and saw the [Petitioner] enter the doorway. She recalled that she screamed because she knew the [Petitioner] "was there to kill [her]." She explained that he had repeatedly threatened to do so if she ever left him and also warned that "he would hang [her] from a tree and tie a tire around [her] neck and burn it, so it would melt over [her] body; and then he would burn [her] to ashes, to where nobody could ever find [her]." According to the victim, the [Petitioner] forcefully put his hands over her mouth to stop her screams and then said in a sarcastic tone of voice, "Hi, honey, I'm home." She described the [Petitioner] as having glazed, red eyes with his veins "popping out of his temples." She testified that the [Petitioner] gripped her and directed her to B.R.S.'s room, explaining that he wanted to see his children, that he was not there to hurt her, that he still loved her, and that he was still wearing his wedding ring. The victim recalled that when the [Petitioner] then asked why she was not wearing her wedding ring, she

3

answered that she had taken it off the previous night prior to a domestic violence group meeting. She recalled that the [Petitioner] responded by calling her a "f[* * *]ing bitch" and hitting her in the face. According to the victim, the [Petitioner] repeatedly asked why she had taken off her ring and if she was dating anyone. She stated that he then walked over to the caller identification box to scroll through the list of callers, intermittently asking, "Who's this person? Is this somebody you're f[* * *]ing? Who is this person? I don't know this person." The victim testified that the [Petitioner] jerked the telephone out of the wall and warned B.R.S. not to call the police, warning that he would otherwise "snap [her] neck." She recalled that the [Petitioner] grabbed her by the back of her hair, forced her down the hallway, and slammed her head into a nail in the wall, which pierced her forehead. The victim stated that the [Petitioner]'s anger escalated and that he called her "a whore."

The victim testified that when she went to the bathroom to clean her head wound, the [Petitioner] followed, continuing to badger her with the question, "Who are you f[* * *]ing?" She stated that the [Petitioner] digitally penetrated her, smelled his hand, and then repeated the same question again. According to C.F.M., the [Petitioner] again asked her about her missing wedding ring and, dissatisfied with her answer, called her "a f[* * *]ing liar" and hit her in the face. She described the children, who were ages nine, six, and two at the time, as crying and scared. She recalled that when the [Petitioner] ordered them to get dressed to go for "a little ride," the three children all dressed hurriedly, not even taking time to put their shoes on even though it was February. The victim explained that she was unable to take her purse with her because the [Petitioner] had "his grip" on her arm. She testified that the [Petitioner] directed B.R.S. and R.M. to move to the back cargo area of the vehicle and lie down as he continued to question the victim about who she was dating. She stated that as he was driving, the [Petitioner] hit her in the eye and then demanded that she perform oral sex on him. She recalled that when she at first refused, the [Petitioner] remarked, "You got three seconds, bitch, or you [won't] have any teeth." The victim testified that she complied with the [Petitioner]'s demand even though her head was still bleeding and her children were in the car. She recalled that when she asked the [Petitioner] where they were going, he replied, "I told you, bitch, what I would do to you, if you ever left me . . . . I've killed your parents. I've decapitated them. I've already been to their house . . . . Now, I'm taking you to where they're at to lay you down beside them."

4

According to the victim, the [Petitioner] drove to his brother's residence and upon his arrival, announced, "[L]ook what I've done to this bitch. I'm coming to f[* * *]ing kill her. This f[* * *]ing whore has taken her ring off. I'm gonna kill this bitch." She testified that the [Petitioner] then asked Maynard for his gun, continued to threaten to kill her, and at one point said, "[I]f you don't give me a gun, I'll find another way to kill her. I'll beat her head in with a hammer. I'll take a can of corn and put it in a pillowcase, or I'm gonna tie her to the back of that truck and I'm gonna pull her behind the truck, like they did that n[* * * *]r in Texas." The victim recalled that the [Petitioner] then grabbed her arm and took her to a bedroom where he "punched" her in the chest and demanded that she remove her clothes. She testified that when Maynard entered the bedroom and she motioned for help, he left the room without offering assistance. She stated that when the [Petitioner] forced her to have sex, she became weak, vomited, and developed a migraine headache for which the [Petitioner] supplied Loritab. The victim testified that Maynard offered her the keys to his truck but warned that the truck might not start and suggested that the [Petitioner] might run her off the road because he still had the keys to their vehicle. The victim explained that she tried to think of ways to escape, but because it was raining and neither she nor the children had any coats or shoes, she did not do so. She expressed fear of calling 911 because the [Petitioner] might find out. She recalled that they were at Maynard's house "[t]hat whole day and most of the next day."

The victim testified that she did call her workplace shortly after her abduction and left a message that she was sick and would not be in to work. She pointed out that the [Petitioner] "was standing right there and that's what he told me to say." She also telephoned her mother at the direction of the [Petitioner], telling her that she was sick and was not bringing the children to her house which was her normal practice. The victim later called the [Petitioner]'s aunt, Sandy Brooks, and told her that the [Petitioner] had hurt her, that she had been bleeding all day and needed help, and that she and the children were afraid for their lives. She testified that the [Petitioner] also talked to Ms. Brooks and said, "Get somebody out there to clean up the blood, before somebody finds it."

The victim recalled that on the following morning, Maynard handed her the telephone and told her to call Ms. Brooks, who then placed a three-way call to the victim's parents. She stated that she again told her parents that she was sick and was not bringing the children to their house. She explained that she did not tell her parents to call the police "[b]ecause I had

5

already heard [the Petitioner] say that he was gonna take me to Louisville, Kentucky, and because I was in fear of my life. I figured he would go ahead and kill me or take off with one of the children." The victim contended that she was never allowed to use the telephone alone but that she also talked to the [Petitioner]'s cousin, Jennifer Reed, and asked her to come to help her. According to the victim, Ms. Reed agreed to help but never arrived. She testified that the ordeal finally came to an end when the [Petitioner] took a nap and Maynard asked her if she wanted him to call the police. She recalled that the police arrived soon thereafter and placed the [Petitioner] in custody. While acknowledging that the [Petitioner] "didn't spend all his time watching [her]" at Maynard's house, she explained that she left her residence with the [Petitioner] only "[b]ecause I thought he was gonna kill me, and I was afraid for my life. I thought, maybe, if I cooperated with him and did what I was told, instead of fighting him, that there was a possibility that I would live."

On cross-examination, the victim maintained she never saw the [Petitioner] sleep during the ordeal. She acknowledged that she had been in the living room with Maynard and the children for about thirty minutes while the [Petitioner] was in another room and that Maynard had not restrained her from using the telephone. She did claim, however, that Maynard told her that the [Petitioner] had directed him to watch the telephone. The victim, who acknowledged that her head wound did not require stitches, recalled that the [Petitioner] took the car keys when he arrived at the Maynard residence. She testified that she chose not to call out to Maynard's neighbors out of fear.

When asked if B.R.S. had ever called the police before, the victim related an incident that occurred in February 2003 at her parents' house when the [Petitioner], in an effort to reconcile a separation, pushed her brother off the porch into the driveway. She recalled that when a gun fell from the coat pocket of her brother, the [Petitioner] grabbed the gun, aimed at her brother, and pulled the trigger, but the gun did not discharge. She testified that the [Petitioner] then pointed the gun at her head and said, "Now, bitch, you're going with me." She stated that she refused to go with the [Petitioner] and held onto the porch railing as the [Petitioner] "pulled at [her], trying to get [her] loose; pulled [her] shirt off, ripped it completely off of [her]." The victim related that when her father intervened, the [Petitioner] went to his truck, held the gun out the window, and warned her that if she did not go with him, he was going to shoot himself. She stated

that B.R.S. called the police on this occasion but acknowledged that the charges against the [Petitioner] were ultimately dismissed.

The victim also testified about a prior incident when she failed to meet the [Petitioner] for lunch at her workplace. She stated that as soon as she saw his face, she knew she "was gonna get it" and the [Petitioner] hit her several times in the face, leaving her with bruises, a black eye, a broken blood vessel in her eye, and a cracked tooth. She recalled that the [Petitioner] refused to let her go back to work that day and took her home instead. She acknowledged that no criminal charges were pressed against the [Petitioner] for this incident.

Officer Stan Goad of the Metropolitan Nashville Police Department was dispatched to the victim's home on February 5, 2004, arriving at approximately 9:00 a.m. After speaking to the victim's parents, the officer observed blood in the bathroom and hallway, a hole in the wall in the hallway, and a broken door frame.

Detective Bruce Pinkerton, who also responded to the dispatch, described the residence: "The front door was pretty much off the hinges. The door facing was laying inside on the floor. I noticed what appeared to be blood droppings, when I first walked in; and they led all through the house. There was an indent[at]ion in the drywall in the hallway." He testified that a telephone appeared to have been "snatched" from the wall in a child's bedroom. Detective Pinkerton talked to the victim's father and telephoned the [Petitioner]'s aunt, Sandy Brooks, in an effort to locate the victim. He recalled that about thirty minutes later, Ms. Brooks returned the call with the victim on the line. The detective testified that the victim said she was all right "in a faint voice" and informed him that the [Petitioner] was with her. According to the detective, he then spoke with the [Petitioner] who said, "We don't need the police. We're trying to get our life together." Detective Pinkerton, who was unable to determine from the conversation the whereabouts of the victim, was given Maynard's telephone number by Ms. Brooks; when he called back, however, he did not get an answer. The detective then called the Smith County authorities and asked them to check for the victim at Maynard's residence. Detective Pinkerton later learned that the victim, the [Petitioner], and the children were at Maynard's house. Detective Pinkerton said he talked to the victim two or three days later and she gave a ten-page, written statement of what had occurred. He had no recollection of the victim telling him during the interview that the [Petitioner] had digitally penetrated her.

7

Joyce Sullivan, the victim's mother, who babysat for the victim's youngest child, testified that in February 2004, the victim typically brought the children to her house every morning, where the older ones would catch the school bus. She stated that when the victim did not bring the children on February 4, 2004, she talked by telephone to the victim "for just about a minute" and then talked to her again the next day. Mrs. Sullivan recalled that when she told the victim that she was coming to get the children because they had missed enough school, the victim responded in a whisper from which she inferred "something was terrible wrong." Mrs. Sullivan testified that she and her husband drove to the victim's residence where they discovered the broken front door, a "hole in the wall," and blood in the kitchen, living room, hallway, and bathroom. Mrs. Sullivan stated that she saw the children's shoes and coats in the living room and "wondered why they went out in the cold" without them. She recalled that she telephoned Sandy Brooks, who returned her call five to ten minutes later with the victim on the line. Mrs. Sullivan stated she could barely hear the victim on the telephone and that she sounded like she was "down in a barrel." Mrs. Sullivan testified that the police were called and given Maynard's name.

Smith County Sheriff's Department Deputy Steven Cowan testified that on February 5, 2004, he was dispatched to Maynard's residence, arriving between 2:00 and 2:30 p.m., to "investigate a female being held against her will." He indicated that he first saw Maynard, who directed him to the back of the house where he found the victim and the [Petitioner]. He described the victim as "very disoriented" and "afraid," and he noticed bruises and marks on her forehead and eye. He pointed out that when he asked the victim a question, the [Petitioner] tried to answer and he recalled that the victim began to answer his questions only after she was separated from the [Petitioner]. He stated that the victim told him that she was being held against her will and wanted to leave.

Smith County Deputy Ronnie Nelson Smith, who also responded to the scene at Maynard's residence, testified that he found blood on the [Petitioner]'s right arm and chest area and a mark and abrasions on the victim's head. He stated that the [Petitioner] was "somewhat calm" but that the victim was sitting with her head down, avoiding eye contact with the officers. Deputy Smith confirmed that every time the officers asked the victim a question, the [Petitioner] "would blurt something out . . . try to answer a question." He testified that the [Petitioner] was arrested and transported to the sheriff's department.

8

## Defense Proof

Ms. Reed, the [Petitioner's] cousin, testified as a defense witness. She claimed she had called Maynard on the evening of February 4, 2004, and, when she heard children playing in the background, asked him who was there with him. She recalled that Maynard informed her that the [Petitioner], the victim, and their children were there, and that when she then talked to the [Petitioner], he was crying and "very upset." She claimed that she also talked to the victim, who, she observed, "did not sound upset at all in any way," telling her everything was "okay." Ms. Reed denied that the victim had asked her for help.

Michael Maynard, the [Petitioner's] brother, testified that on the morning of February 4, 2004, the [Petitioner], the victim, and their children came to his house around 6:30 or 7:00 a.m. He recalled that he put his "guns and everything up, because of the small children" and because the [Petitioner] and the victim were arguing. Maynard stated that he invited all of them inside and that he then learned that the [Petitioner] had apparently found another man in the victim's house. He testified that the victim was bleeding and had "a little hole" in her head "like a pimple been's popped." He denied that the [Petitioner] admitted ramming her head into a wall. Maynard stated that he and the children watched television while the [Petitioner] and the victim went to the back bedroom. He claimed that when he heard a noise, he went to the bedroom and saw that both the [Petitioner] and the victim had removed their pants. He then heard the victim say, "Not like this." He denied that the victim asked him for help. Maynard testified that he then returned to the living room, and the [Petitioner] and the victim subsequently joined him there. Maynard claimed that the [Petitioner] fell asleep around 9:00 a.m. in one of the bedrooms and slept "ninety percent of the time" he was there. He contended that he offered the victim the keys to either of his two trucks, which were in working condition, and insisted that she could have left if she had wanted. He confirmed that the [Petitioner] and the victim had arrived in the [Petitioner's] vehicle and that the [Petitioner] had said he was not going to let her take the car. He testified that he offered the victim a Lortab, which she took "around evening time," and that the victim was allowed to use the telephone. Maynard denied that he left the house while the [Petitioner] and the victim were there and refuted the claim that the [Petitioner] had asked him for a gun. He acknowledged that he talked to his father, Jerry Maynard, and his cousin, Jennifer Reed, by telephone and

9

that Sandy Brooks, who lived in Davidson County, called and informed him that a detective was trying to reach them.

Maynard acknowledged that on the second day of the [Petitioner's] stay at his residence, the victim told him that the [Petitioner] had touched her inappropriately. He also admitted that in his initial statement to the police, he had stated that the [Petitioner] had rammed the victim's head into a wall with a nail but did not mean to do so. He also acknowledged that the [Petitioner] expressed a desire to return to Nashville to clean up the blood at the victim's residence. Maynard contended that he could not remember if the victim was wearing shoes when she arrived at his house but he did acknowledge that he gave her some house slippers to wear when they went to the sheriff's department.

The [Petitioner] testified that just before the events leading to his convictions, he had been in jail for two and a half months on allegations of aggravated burglary made by the victim's parents. He claimed that the victim and the children had visited him in jail and that he spoke to the victim on the afternoon of February 3rd before he made bail. He denied that the victim had asked him not to come home after his release and claimed that all of his belongings were at the victim's house. He stated that his younger brother picked him up at the jail and that they went to his brother's house in Madison. The [Petitioner] claimed that he walked fifteen miles to the victim's house and arrived there between 5:30 and 6:00 a.m. He contended that when he realized that all of the locks had been changed and a deadbolt had been placed on the front door, he knocked on the door and, when no one answered, he saw through a window that the victim was with a man. He admitted that he kicked in the front door and claimed that the man tried to hide. He asserted that when he ran after the man, he pushed the victim out of the way, accidentally knocking her into the wall. The [Petitioner] claimed that he and the man "scuffled," but the man "got loose and r[a]n out the door." The [Petitioner] acknowledged that he hit the victim in the eye and conceded that the injuries to her eye and chin could not have been caused by one punch.

The [Petitioner] admitted that the victim's head was bleeding and that she went to the bathroom to wash off the blood. He denied that he digitally penetrated her while they were in the bathroom. The [Petitioner] acknowledged that he asked the victim why she was not wearing her wedding ring and why she had a man there, and asserted that she replied, "He's just a friend." The [Petitioner] stated that he then started scanning

10

the caller identification box in B.R.S.'s room and asked the victim about certain telephone numbers. He acknowledged that he "threw" the caller identification box but denied that he ripped the telephone from the wall or threatened to snap B.R.S.'s neck if she called the police. He claimed that he and the victim then went to the living room and the children followed. He admitted that he told the victim to get B.M. dressed and that he directed R.M. to get dressed because he was "taking them and leaving." *The [Petitioner] stated that B.R.S. was not his daughter and that he did not require her to go with him.* He contended that he picked up B.M. and headed out the door, and the victim followed, saying, "You're not taking the kids without me." He stated that he put B.M. and R.M. in his vehicle and that the victim and B.R.S. got in after him. He acknowledged that he and the victim were arguing but denied that he told her that he had killed her parents or had threatened to kill her. The [Petitioner] denied that he hit the victim while he was driving but acknowledged that he asked her to perform oral sex on him.

The [Petitioner] stated that he then drove to Maynard's house, who asked what had happened and invited them inside. The [Petitioner] claimed that the victim then voluntarily called her employer and her mother. He testified that he and the victim later went to a bedroom while the children watched television and that when he asked to have sex, she replied, "No, not like this. It's not right." The [Petitioner] claimed that when he said, "Yeah, let's do it," and removed his pants, the victim also removed her pants. The [Petitioner] acknowledged that Maynard came into the room while they were having sex and asked if everything was all right. He stated that he and the victim then returned to the living room. He said that he later went to a bedroom where he slept until about 7:00 p.m. The [Petitioner] acknowledged that he talked to his cousin, Jennifer Reed, by telephone outside on the deck and that he was crying and upset during their conversation. He stated that Ms. Reed then spoke to the victim outside his presence. The [Petitioner] denied that he held the victim against her will and claimed that his only intention was to take his children, B.M. and R.M., to Maynard's house.

The [Petitioner] testified that when Detective Pinkerton called the next day, he explained that the victim's parents had "tried to make something really bad outta this." He recalled that he went back to sleep and was later awakened by Maynard, who told him the police were there. The [Petitioner] confirmed "what happened" and that when Officer Cowan asked the victim if she wanted to press charges, he shook his head, "like,

11

'Don't do this, man . . . . We done been through this . . . a hundred times.'" The [Petitioner] claimed that when he was taken into custody, he thought the charges against him were for "domestic assault, because [the victim] had a knot on her head and a black eye." The [Petitioner] denied having told R.M. that if he found a gun he would kill the victim, claiming someone had "brainwashed" his daughter into saying that. The [Petitioner] denied that he had planned to take the victim across state lines and denied telling Maynard he wanted to clean up the blood at the victims' house.

The [Petitioner] also testified about the 2003 incident at the Sullivans' home, claiming that he tried to hug the victim as she pushed him away. He stated that the victim's brother threatened to get his pistol if the [Petitioner] did not leave, else he was going to shoot him. According to the [Petitioner], he pushed the victim's brother when he returned two minutes later with a pistol. The [Petitioner] claimed that because he was in danger, he grabbed the gun, pointed it at the victim's brother, and grabbed the victim, asking her to go with him. He claimed that the victim's father then grabbed her by the shirt and pulled her away from the [Petitioner], tearing her shirt in the process. The [Petitioner] insisted that he then went home and the victim later informed him he would be arrested for "pulling that gun on [them]."

*Mitchell*, 2006 WL 1506519, at *1-8 (emphasis added). Based upon this evidence, the jury convicted the Petitioner of one count of especially aggravated kidnapping, two counts of aggravated kidnapping, and one count of assault. The Petitioner appealed his convictions and sentence, arguing that the evidence was insufficient to sustain his convictions, that the trial court had improperly admitted evidence of his prior bad acts, and that his sentence was excessive. *Id.* at *1. This Court affirmed the trial court's judgments. *Id.*

The Petitioner then filed his first petition for habeas corpus relief, alleging that his trial counsel was ineffective and that the evidence was insufficient to support his conviction for the kidnapping offense involving his stepdaughter. *Robert L. Mitchell v. Cherry Lindamood, Warden*, No. M2007-00051-CCA-R3-HC, 2007 WL 2295592, at *1 (Tenn. Crim. App., at Nashville, Aug. 8, 2007), *no perm. app. filed.* The habeas corpus court dismissed the petition, finding that "the Petitioner's judgment is not void, that his sentence has not expired, and that he has failed to even allege claims that would render his convictions void." *Id.* The Petitioner appealed, and this Court affirmed. *Id.*

The Petitioner then filed a petition for post-conviction relief, in which he alleged that his trial counsel was ineffective for not arguing that a stepparent could not be guilty

12

of the aggravated kidnapping of a stepchild; for not interviewing the Petitioner's neighbors; for not arguing that the Petitioner's sentences violated the *Blakely* decision; for not questioning his stepdaughter as to whether a man had been living with her mother; for not seeking a special jury instruction regarding the alleged inconsistent testimony of the victim; and for not moving to dismiss the superseding indictment. *Robert L. Mitchell v. State*, No. M2008-02121-CCA-R3-PC, 2009 WL 3103772, at *1 (Tenn. Crim. App., at Nashville, Sept. 29, 2009), *perm. app. denied* (Tenn. Mar. 15, 2010). The post-conviction court dismissed the petition, and this Court affirmed the dismissal. *Id.*

In our opinion affirming the post-conviction court's judgment, we addressed the issue of whether the Petitioner could be guilty of the aggravated kidnapping of his stepchild, B.R.S. *Id*. at *12-13. We stated:

> The [P]etitioner argues that the failure of the trial court to charge the jury as to the definition of the word "unlawful" resulted "in the jury not being fully and accurately charged with the applicable law." Additionally, he asserts that "the portion of the definition that was omitted contained the language that to be unlawful, the removal or confinement must be done without the consent of a parent, and the [Petitioner] was the parent of the alleged victim." The State responds that the Petitioner was the stepfather, rather than the biological father, of B.R.S. and that, even if he were, the indictment alleged, and the State proved, that he kidnapped B.R.S. by "force, threat or fraud."
>
> . . . .
>
> Especially aggravated kidnapping is defined as follows:
>
> > (a) Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302:
> >
> > (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon;
> >
> > (2) Where the victim was under the age of thirteen (13) at the time of the removal or confinement;
> >
> > (3) Committed to hold the victim for ransom or reward, or as a shield or hostage; or

13

(4) Where the victim suffers serious bodily injury.

Tenn. Code Ann. § 39-13-305(a).

False imprisonment is defined as: "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a). Section 39-13-301(13) defines "unlawful" as:

[W]ith respect to removal or confinement, one that is accomplished by force, threat or fraud, or, in the case of a person who is under the age of thirteen (13) or incompetent, accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's or incompetent's welfare.

The [P]etitioner argues that the following exchange, as B.R.S.'s mother was testifying, established that she "considered the [P]etitioner standing in the position of father to her child by a previous marriage":

Q And, Ms. Mitchell, do you know the [Petitioner] in this case, Robert Mitchell?

A Yes, sir.

Q And how do you know him?

A He's my-father of my children and husband.

The State responds that, in his pro se petition for post-conviction relief, the [P]etitioner refers to B.R.S. as his "stepdaughter." ***Tennessee Code Annotated section 36-2-302(5), regarding paternity and legitimation, defines "parent" as the biological mother or father of a child. Thus, the [P]etitioner was not the "parent" of B.R.S.***

We will review the indictments for especially aggravated kidnapping. Indictment 2004-D3144, the first indictment, alleged that the [P]etitioner

on the 4th day of February, 2004, in Davidson County, Tennessee and before the finding of this indictment, did knowingly and unlawfully remove or confine [B.R.S.], so as

14

to interfere substantially with the liberty of [B.R.S.], and [B.R.S.] was less than thirteen (13) years of age at the time of the removal or confinement, in violation of Tennessee Code Annotated § 39-13-305, and against the peace and dignity of the State of Tennessee.

This was superseded by indictment 2005-A-241, which alleged that the [P]etitioner

on the 4th day of February, 2004, in Davidson County, Tennessee and before the finding of this indictment, did knowingly and unlawfully remove or confine by use of force, threat, or fraud, [B.R.S.], so as to interfere substantially with the liberty of [B.R.S.], and [B.R.S.] was less than thirteen (13) years of age at the time of the removal or confinement, in violation of Tennessee Code Annotated § 39-13-305, and against the peace and dignity of the State of Tennessee.

Thus, the second indictment added the language that B.R.S.'s removal or confinement was "by use of force, threat, or fraud."

As to the [P]etitioner's claim that trial counsel should have sought dismissal of the superseding indictment, counsel testified:

[]As to the especially-aggravated kidnapping charge, . . . I did file a Twelve-(b) Motion.

As indicted prior to trial, the District Attorney's Office had failed to allege that the false imprisonment was committed unlawfully by force, threat or fraud.

My understanding, you know, what the [*State v.] Goodman* [, 90 S.W.3d 557 (Tenn. 2002),] case says is that, if you are to charge a parent or someone acting . . . as a parent, which [the Petitioner] was, that you have to allege the false imprisonment correctly in the indictment.

I filed . . . what I felt to be a very good Twelve-(b) Motion in this case. It was heard, the Judge took it under advisement, and [the prosecutor] filed a superseding indictment that fixed the issue.

So, there was no issue. I don't remember . . . any particular problem with the way [the trial judge] did the-

Q So, you're saying that, based on your knowledge of the law and your experience, that the fact that the Indictment was changed to include the force [,] threat or fraud fixed the fact of the child or-

A Right.

Q-someone being-

A I'm a little con-

Q-under the guardianship of the [Petitioner].

A Yes . . . . I'm confused with the issue of whether or not [the Petitioner] was [B.R.S.'s]-the question is from both sides-whether [the Petitioner] was acting as [B.R.S.'s] father.

I think there was no question that he was; and, in fact, that was the force of my first Twelve-(b) Motion, that because he was, therefore, they needed to-the District Attorney's Office-to allege this especially-aggravated kidnapping and they needed to indict it in a particular way adding those words-those magic words, if you will, to the false imprisonment charge.

And I had some stipulated facts that I think that [the prosecutor] agreed to in the Twelve-(b) Motion, that would prove that [the Petitioner] was [B.R.S.'s] punitive [sic] father.

That wasn't the issue. The issue was a father or punitive [sic] father can especially-aggravatedly kidnap [sic], if you will, a child, if it's committed by force, threat or fraud. That's my understanding of the law.

The post-conviction court found that this claim was without merit:

16

Petitioner alleged trial counsel was ineffective in failing to file a second motion to dismiss the indictment as to count one, Especially Aggravated Kidnapping. Trial counsel testified she did not believe there was a basis on which to file the motion and the Court agrees. The indictment alleged he "did knowingly and unlawfully remove or confine by use of force, threat, or fraud, [the victim]" and the Court finds that this charge is sufficient. The jury found that the facts of the case supported the elements of the crime charged. The allegation has not been proven by clear and convincing evidence, therefore it is dismissed.

The record supports this determination by the post-conviction court. It follows that since trial counsel was not ineffective in concluding that there was no basis for filing a motion to dismiss the superseding indictment, appellate counsel, likewise, was not ineffective for not raising this as an issue on appeal.

*Mitchell*, 2009 WL 3103772, at \*11-14.

In this case, the Petitioner then filed a second petition seeking habeas corpus relief. In the petition, he contended that he was entitled to habeas corpus relief from the judgment of conviction related to the especially aggravated kidnapping of his stepdaughter. He asserted that the allegation of "force, threat, or fraud" articulated in the indictment did not support his conviction and was unconstitutionally vague and overbroad when applied to a parent. He further contended that the indictment failed to charge aggravating factors that, he asserted, were required to convict a parent of especially aggravated kidnapping.

The habeas corpus court found that the petition did not meet the standard required for relief. It stated:

There is no proof from the judgment form that the Court was without jurisdiction to enter the judgment in this case. The [P]etitioner challenges the legality of his conviction for especially aggravated kidnapping. The Court notes that the issue has been raised and dismissed in post-conviction and on both direct and post-conviction appeals. The indictment alleged he "did knowingly and unlawfully remove or confine by use of force, threat, or fraud, [the victim]." This Court and the Court of Criminal Appeals found that this charge complies with the holding in *State v. Goodman*, 90 S.W.3d 557, 565 (Tenn. 2002), where our [S]upreme [C]ourt concluded that an

17

indictment charging a father with the kidnapping of his daughter was defective because it failed "to allege that the defendant removed or confined the minor child by force, threat, or fraud." This Court and the Court of Criminal Appeals disagree with the [P]etitioner's interpretation of *State v. Goodman*, and find that it supports the [P]etitioner's convictions. *See Robert L. Mitchell v. State of Tennessee* M2008-02121-SC-R11-PC, at 21.

The Petitioner appeals the judgment of the habeas corpus court.

## II. Analysis

On appeal, the Petitioner contends that the habeas corpus court erred when it dismissed his petition. The Petitioner asserts that the allegation in his indictment that he used "force, threat, or fraud" is unconstitutionally vague and overbroad; thus, entitling him to habeas relief. He notes that relevant Tennessee code sections define "custodial interference." He asserts that he was not restricted by any court order regarding "his daughter's custody or control," so he could not commit custodial interference. The Petitioner then cites *State v. Goodman*, 90 S.W.3d 557, 565 (Tenn. 2002), as a case that discusses the relevant statutes in relation to a parent charged with especially aggravated kidnapping. In *Goodman,* the defendant argued that his indictment was defective because he, as a parent, could not be prosecuted for especially aggravated kidnapping of his child because the child's confinement was not without parental consent as required by the false imprisonment statute. The *Goodman* Court concluded that the defendant was not subject to prosecution for especially aggravated kidnapping absent allegations in the indictment that the removal or confinement was accomplished by "force, threat, or fraud." Goodman, 90 S.W.3d at 565. The Petitioner asserts that the allegations of "force, threat, or fraud" are unconstitutionally vague and overbroad. The State contends that the Petitioner has not met his burden of proving that he is entitled to habeas corpus relief.

Article I, section 15 of the Tennessee Constitution guarantees the right to seek habeas corpus relief. *See Faulkner v. State*, 226 S.W.3d 358, 361 (Tenn. 2007). Although the right is guaranteed in the Tennessee Constitution, the right is governed by statute. T.C.A. §§ 29-21-101, -130 (2012). The determination of whether habeas corpus relief should be granted is a question of law and is accordingly given de novo review with no presumption of correctness given to the findings and conclusions of the court below. *Smith v. Lewis*, 202 S.W.3d 124, 127 (Tenn. 2006) (citation omitted); *Hart v. State*, 21 S.W.3d 901, 903 (Tenn. 2000). Although there is no statutory limit preventing a habeas corpus petition, the grounds upon which relief can be granted are very narrow. *Taylor v. State*, 995 S.W.2d 78, 83 (Tenn. 1999).

It is the burden of the petitioner to demonstrate by a preponderance of the evidence that "the sentence is void or that the confinement is illegal." *Wyatt v. State*, 24 S.W.3d 319, 322 (Tenn. 2000). In other words, the very narrow grounds upon which a habeas corpus petition can be based are as follows: (1) a claim there was a void judgment which was facially invalid because the convicting court was without jurisdiction or authority to sentence the defendant; or (2) a claim the defendant's sentence has expired. *Stephenson v. Carlton*, 28 S.W.3d 910, 911 (Tenn. 2000); *Archer v. State*, 851 S.W.2d 157, 164 (Tenn. 1993). "An illegal sentence, one whose imposition directly contravenes a statute, is considered void and may be set aside at any time." *May v. Carlton*, 245 S.W.3d 340, 344 (Tenn. 2008) (citing *State v. Burkhart*, 566 S.W.2d 871, 873 (Tenn. 1978)). In contrast, a voidable judgment or sentence is "one which is facially valid and requires the introduction of proof beyond the face of the record or judgment to establish its invalidity." *Taylor*, 995 S.W.2d at 83 (citations omitted); *see State v. Ritchie*, 20 S.W.3d 624, 633 (Tenn. 2000). The petitioner bears the burden of showing, by a preponderance of the evidence, that the conviction is void or that the prison term has expired. *Passarella v. State*, 891 S.W.2d 619, 627 (Tenn.Crim.App.1994).

Although defenses based on the validity of an indictment must ordinarily be raised pretrial,[1] "the validity of an indictment and the efficacy of the resulting conviction may be addressed in a petition for habeas corpus when the indictment is so defective as to deprive the court of jurisdiction." *Dykes v. Compton*, 978 S.W.2d at 528, 529 (Tenn. 1998). Generally, an indictment is valid if it contains information that is sufficient: "(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) protect the accused from double jeopardy." *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997); *see also* T.C.A. § 40-13-202 (2015).

It is also permissible for a trial court to summarily dismiss a petition of habeas corpus without the appointment of a lawyer and without an evidentiary hearing if there is nothing on the face of the judgment to indicate that the convictions addressed therein are void. *See Passarella*, 891 S.W.2d at 627; *Rodney Buford v. State*, No. M1999-00487-CCA-R3-PC, 2000 WL 1131867, at *2 (Tenn. Crim. App., at Nashville, July 28, 2000), *perm. app. denied* (Tenn. Jan. 16, 2001).

After a review of the record before us, we conclude that the trial court did not err when it summarily dismissed the Petitioner's petition. First, we note that this Court has previously held that the record proved that the Petitioner was not B.R.S.'s "parent" as defined by the relevant statute. 2009 WL 3103772, at *13 (stating, "We first note that this Court has previously held that Tennessee Code Annotated section 36-2-302(5),

---

[1] *See* Tennessee Rule Criminal Procedure 12(b)(2), (f).

regarding paternity and legitimation, defines "parent" as the biological mother or father of a child. Thus, the petitioner was not the "parent" of B.R.S."). Because the Petitioner is not B.R.S.'s "parent," the indictment would have been valid without the language required by *Goodman* for circumstances involving a parent as the perpetrator.

Further, even if we were to assume that the Petitioner is B.R.S.'s parent, we conclude that the indictment is valid. The superseding indictment included the language articulated in *Goodman* of "force, threat, or fraud." We find unpersuasive the Petitioner's argument that this language is "unconstitutionally vague or overbroad."

The constitutions of the United States and the State of Tennessee guarantee defendants in all criminal cases due process of law and the right to a fair and impartial jury. *State v. Carruthers*, 35 S.W.3d 516, 559 (Tenn. 2000). When a defendant challenges the constitutionality of a statute, the general principles of statutory construction apply. Appellate courts are charged with upholding the constitutionality of statutes wherever possible. *State v. Lyons*, 802 S.W.2d 590, 592 (Tenn. 1990). In other words, we are required to indulge every presumption and resolve every doubt in favor of the constitutionality of the statute when reviewing a statute for a possible constitutional infirmity. *Id.*; *see also In re Burson*, 909 S.W.2d 768, 775 (Tenn. 1995). Generally, the language of a penal statute must be clear and concise to give adequate warning so that individuals might avoid the prohibited conduct. *See State v. Boyd*, 925 S.W.2d 237, 242-43 (Tenn. Crim. App. 1995). A statute is void for vagueness if it is not "sufficiently precise to put an individual on notice of prohibited activities." *State v. Thomas*, 635 S.W.2d 114, 116 (Tenn. 1982); *see also State v. Wilkins*, 655 S.W.2d 914, 915 (Tenn. 1983), superseded by statute as stated in *State v. Dominy*, 6 S.W.3d 472 (Tenn. 1999). The "void for vagueness" doctrine is based on fairness; it is intended "only to give 'fair warning' of prohibited conduct." *Phillips v. State Bd. of Regents of State Univ. and Cmty.*, 863 S.W.2d 45, 48-49 (Tenn. 1993).

A criminal statute "shall be construed according to the fair import of [its] terms" when determining if it is vague. T.C.A. § 39-11-104. "Due process requires that a statute provide 'fair warning' and prohibits holding an individual criminally liable for conduct that a person of common intelligence would not have reasonably understood to be proscribed." *State v. Burkhart*, 58 S.W.3d 694, 697 (Tenn. 2001) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972)). Nevertheless, the Tennessee Supreme Court has noted that "absolute precision in drafting prohibitory legislation is not required since prosecution could then easily be evaded by schemes and devices." *Wilkins*, 655 S.W.2d at 916; *see also Burkhart*, 58 S.W.3d at 697; *State v. McDonald*, 534 S.W.2d 650, 651 (Tenn. 1976). To determine whether a statute is unconstitutionally vague, a court should consider whether the statute's prohibitions are not clearly defined and are thus susceptible to different interpretations regarding that which the statute actually proscribes. *State v. Whitehead*, 43 S.W.3d 921, 928 (Tenn. Crim. App. 2000).

Therefore, a statute is not unconstitutionally vague "'which by orderly processes of litigation can be rendered sufficiently definite and certain for purposes of judicial decision.'" *Wilkins*, 655 S.W.2d at 91 (quoting *Donathan v. McMinn County*, 213 S.W.2d 173, 176 (1948)).

The statute at issue in this case states that "especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302 . . . Where the victim was under the age of thirteen (13) at the time of the removal or confinement." T.C.A. § 39-13-502(a)(2). False imprisonment is committed when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. 39-13-302(a). The term "unlawful" is defined as:

> [W]ith respect to removal or confinement, one that is accomplished by force, threat or fraud, or, in the case of a person who is under the age of thirteen (13) or incompetent, accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's or incompetent's welfare.

T.C.A. § 39-13-301(15).

The Petitioner contends that the statute is vague because a parent may use lawful force, threats, or fraud to impose discipline on a child that would be unlawful if imposed by a stranger. The State counters that the force used by the parent must be "unlawful" and that a parent of ordinary intelligence would not have reasonable grounds to believe that he could not be subject to criminal liability under the kidnapping statute if he or she committed unlawful force, threats, or fraud to kidnap his child. We agree with the State. While we acknowledge, like another panel of this Court has, that under some circumstances, it may be necessary to resolve the question of the extent to which a defendant's status as a parent shields him from prosecution for kidnapping his child, such analysis is not necessary in this case. First, the Petitioner is not the victim's parent, as we discussed above. Second, this would not be an appropriate consideration for a petition for habeas corpus relief, as it goes to the sufficiency of the evidence and not the vagueness of the statute. The Petitioner has not proven that his indictment was defective or that the resulting judgment was void. He is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the habeas corpus court's judgment.

_____

21

ROBERT W. WEDEMEYER, JUDGE